**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
DANAMARIE CAMPBELL,
                                  Plaintiff,

                                                           **ORDER**
             -against-                           12-CV-5051 (ADS)


MICHAEL J. ASTRUE, Commissioner, Social
Security Administration,
                                  Defendant.
---------------------------------------------------------------X
<u>**APPEARANCES:**</u>

**The Office of Christopher James Bowes**
*Attorney for the Plaintiff*
54 Cobblestone Drive
Shoreham, NY 11786
             By: Christopher James Bowes, Esq., Of Counsel

**United States Attorney's Office, Eastern District of New York**
*Attorneys for the Defendant*
P 610 Federal Plaza, 5th Floor
Central Islip, NY 11722-4454
             By: Vincent Lipari, Assistant U.S. Attorney

**SPATT, District Judge**.

             On October 19, 2012, the Plaintiff Danamarie Campbell (the "Plaintiff") commenced this

action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a

determination by the Commissioner of Social Security (the "Commissioner") to deny the

Plaintiff's application for disability insurance benefits.

             Presently before the Court are the parties' cross motions pursuant to Federal Rule of Civil

Procedure ("Fed. R. Civ. P.") 12(c) for judgment on the pleadings.  For the reasons set forth

below, the Court denies the Plaintiff's motion and grants the Defendant's cross-motion.

# I. BACKGROUND

## A. The Plaintiff's Background

The Plaintiff was born in Jamaica on July 18, 1976 and was thirty-three years old at the time of the automobile accident which caused the injuries at issue in this case.  (R. 86, 90.)  She emigrated to the United States, graduated from high school in the United States, and completed one semester of college.  (R. 29.)  The parties do not specify the dates when these events occurred.  Nor do they specify what high school and college the Plaintiff attended.

In her application for disability benefits under the Act, the Plaintiff stated that from 1992 to 2001, she worked as a cashier at Kentucky Fried Chicken, White Castle, Payless Shoe Store, Sears, and BJ's Wholesale Club.  (R. 111, 139.)  The Plaintiff stated that these jobs involved tasks, such as, taking orders, preparing food for customers, stocking inventory, organizing items on shelves, and working at the cash register.  (R. 113–115.)

She also stated that from 1995 to 2009, she worked as a home care aide at assisted living facilities.  (R. 139.)  The Court notes that it appears from her application that from 1995 to 2001, she performed worked as a cashier and a home care aide at the same time.  However, her application does not state the dates when she was employed by these businesses or what her hours were when she was employed.  Thus, it is not clear from the record whether during this period she worked as both a home health care aide and a cashier on a part-time basis.

With respect to her job as a home care aide, she testified that her duties entailed providing personal care to residents at the facilities, assisting transfer of residents in and out of beds, and distributing food to residents.  (R. 32.)  In connection with these tasks, the Plaintiff estimated she spent "seven and a half hours" standing.  (R. 33.)

**B. The Medical Evidence**

    **1. The March 17, 2009 Emergency Room Visit**

    On March 17, 2009, the Plaintiff's car was rear-ended by another car.  (Tr. 172.)  As a result, she sustained a "whiplash type injury" and jammed her finger but did not lose consciousness.  (Id.) She was subsequently taken to an emergency room at New Island Hospital ("New Island") in Bethpage, New York, where X-rays were taken.  (Tr. 151.)

    At the emergency room, she was seen by Dr. Scott Springer.  (R. 154.)  In a status report Dr. Springer stated:

> Findings: AP, lateral and open-mouth views of cervical spine. There is straightening of the normal curve which could reflect spasm.  There is no fracture, subluxation or prevertebral soft tissue swelling. Mild degenerative change greatest at C-7.

> Impression: Straightening of the normal lordctic curve may reflect spasm.  No fracture.  If symptoms persist recommend further workup.

(R. 154.)

    Dr. Springer diagnosed her with a cervical sprain and prescribed 400 mg of ibuprofen and 10mgs of Flexeril.  (R. 173.)  Nicole Leggio ("Leggio"), a physician's assistant at New Island, later increased her medication to 800 mg of ibuprofen and replaced the 10 mgs of Flexeril with 2 mgs of Valium.  (Id.)

    **2. The Post-Accident Medical Evidence**

        **a. Treatment by Drs. Gentile and Gonya**

    On March 24, 2009, the Plaintiff was referred by Dr. Cecora and Leggio to Dr. David A. Gentile, an osteopath.  (R. 173.)  In a report regarding the Plaintiff's visit, Dr. Gentile noted, "Patient has guarded neck spasm, tingling into the right arm, and occasionally, tingling into the

right jaw region." (Id.) The report further described Dr. Gentile's observations of the Plaintiff's injuries:

> Positive swelling in through the right arm and exacerbation of tingling. Patient has guarded neck spasm, right sided trapezial, cervical paravertebral, levator and rhomboid. Fine motor affected on the right hand with grip strength and negative Tinel's. Patient has vibratory intact and tactile intact.

(R. 174.)

Dr. Gentile diagnosed the Plaintiff with "cervical radiculopathy, muscle spasm, and motor vehicle accident injury." (Id.) He provided the Plaintiff with "trigger point injections" for her pain and noted that following the injections, the Plaintiff's "pain/symptoms reduced with increased range of motion." (Id.)

On April 1, 2009, Dr. Gentile referred the Plaintiff for a Magnetic Resonance Imaging ("MRI") of her cervical spine. (R. 159.) The MRI revealed:

> Straightening of the normal cervical lordosis with mild reversal. Small central posterior protruded disc herniation at the C6-7 level coming in contact with the ventral aspect of the cervical spinal cord. Tiny central posterior protruded disc herniation at the C5-6 level. No evidence for edema with the cervical spinal cord. Patent neural foramina bilaterally.

(Id.)

On April 16, 2009, Dr. Gary Gonya, an orthopedic surgeon, performed a physical exam of the Plaintiff. (R. 176.) During the exam, the Plaintiff complained of "significant pain . . . in the right upper extremities" and stated that she was "having difficulty with fine motor control in the right hand." (Id.) She described the pain in her neck and her arm as a "7/10" in severity. (Id.) She also told Dr. Gonya that she had been "going to physical therapy, but . . . that every time she goes to a session, [she] feels . . . more symptomatic." (Id.)

After performing the physical exam, Dr. Gonya described her condition as follows:

> Patient is in obvious discomfort. Positive Spurling on the right, negative on the left. There is no signs of shoulder impingement. Tender to palpitation throughout the paraspinal musculature in cervical and thoracic. . . . No focal or sensory deficit in the lower extremities. Able to stand heel stand. No pain with internal or external rotation of the hip.

(R. 175.) Dr. Gonya diagnosed the Plaintiff with "[c]ervical disk herniation and radiculopathy" and advised the Plaintiff to "continue anti-inflammatories, muscle relaxant . . , and physical therapy." (R. 176.)

On May 4, 2009, the Plaintiff had a follow-up appointment with Dr. Gentile, her osteopath. (R. 177.) He noted that the Plaintiff was "still having right-sided cervical pain, radiculopathy, [and] some right ear fullness." (R. 177.) Dr. Gentile continued to diagnose the Plaintiff with "[c]ervical radiculopathy, cervical disc disease." (Id.) He treated her with "gently osteopathic manipulative medicine," which included a "[t]rigger point injection . . . in the right trapezial region" and a prescription for Darvocet, Celeza, and Nexium. (Id.) He also referred the Plaintiff for X-Rays of her "T-spine, right shoulder and right elbow." (Id.)

On May 11, 2009, the Plaintiff returned to Dr. Gentile. (R. 178.) At this visit, she complained of "numbness [and] tingling in the right 1st and 2nd digits" of her right hand. (Id.) Dr. Gentile noted that on May 8, 2011, the Plaintiff had X-Rays for her T-Spine, right elbow, and right shoulder. (Id.) These X-Rays were "negative." (Id.) He noted that the Plaintiff had "full range of motion" in her neck but had "[t]ender points and trigger points in the right trapezial and levator region." (Id.)

At a May 18, 2009 follow-up visit, Dr. Gentile again noted that the Plaintiff was "doing well with injections" and "having success with Neurontin." (R. 179.) However, the Plaintiff was "still having cervical radicular pain and spasm." (Id.) Again, Dr. Gentile treated the Plaintiff

with trigger point injections in her "trapezial region." (Id.) He increased her prescription for Neurontin from 100 mgs to 200 mgs and advised her to continue with physical therapy. (Id.)

Following a June 8, 2009 visit, Dr. Gentile stated that the Plaintiff "is doing very well with manipulation and injections." (R. 180.)

On June 22, 2009, the Plaintiff attended a follow-up appointment with Dr. Gentile. (R. 181.) Dr. Gentile's assessment was similar to his earlier assessments — he found that the Plaintiff was "doing well with osteopathic treatment and injections." (Id.) He further noted that an "EMG done by a neurologist" showed that the Plaintiff had "no nerve damage." (Id.)

Three days later, on June 25, 2009, the Plaintiff returned to Dr. Gentile's office. (R. 184.) Dr. Gentile noted that the Plaintiff had "right shoulder [and] right cervical pain and spasm" but was otherwise "doing well with manipulation injections." (Id.) He administered additional trigger point injections into her "rhomboid muscle right side." (Id.)

The Plaintiff received a similar prognosis from Dr. Gentile following a July 2, 2009 visit: "Patient is doing very well with manipulation and injections." (R. 185.)

### b. Treatment by Dr. Cappellino

On June 23, 2009, the Plaintiff was examined by Dr. Anthony Capellino, an orthopedic surgeon. (R. 205.) In his report of the examination, Dr. Capellino stated that the Plaintiff's "cervical spine shows diffuse midline tenderness from C1 to C7"; "tenderness" in the right paraspinal and parascapular"; and "spasms." (Id.) He further noted that the Plaintiff's "[r]ange of motion is full" but that she had "some discomfort with flexion, extension, rotation, and lateral bending." (Id.) Examinations of her right shoulder, right elbow, and right wrist showed "no tenderness" and full "range of motion." (Id.) He advised the Plaintiff to "proceed with conservative measures and a home exercise regimen." (Id.)

6

On September 9, 2009, the Plaintiff returned to Dr. Cappellino. (R. 209.) The Plaintiff told him that she continued to experience pain in her neck and hands, as well as headaches. (Id.) In his report of the examination, Dr. Cappellino noted that there was still "diffuse tenderness" in the Plaintiff's spinal region and some "restriction with flexion, extension, rotations, and lateral bending." (Id.) However, his examination of the Plaintiff's right shoulder, elbow, and wrist did not indicate any additional symptoms. (Id.)

The Plaintiff saw Dr. Cappellino for follow-up appointments on October 21, 2009; December 2, 2009; January 13, 2010; March 3, 2010; and April 14, 2010. (R. 211–15.) At these visits, the Plaintiff continued to complain of headaches, as well as cramping and burning sensations in her arms and fingers. (Id.) In his examinations of the Plaintiff, Dr. Cappellino continued to find "diffuse mild tenderness" and muscle spasms in the Plaintiff's cervical spine. (Id.) However, he also generally found that the Plaintiff had full range of motion in the movement of her spine, elbows, and wrists. (Id.)

### c. Treatment by Dr. Paticoff

On September 10, 2009, the Plaintiff met with Dr. Joshua Paticoff, a pain management specialist. (R. 234–36.) In his report, Dr. Paticoff notes that examination of the Plaintiff's cervical spine revealed "muscular tension" in her neck with "multiple focal spasms." (R. 235.) However, he noted that the Plaintiff's cervical spine had good range of movement in "all directions." (Id.)

In addition, Dr. Paticoff performed a neurological exam on the Plaintiff and found that she had "4/5 motor strength RUE and 5/5 motor strength LUE" and a mild decrease in sensation to light touch over medial right distal upper extremity." (Id.) Dr. Paticoff concurred with the diagnosis of Drs. Cappellino and Gentile and diagnosed the Plaintiff with "[c]ervical radiculitis"

and a "herniated disc." (Id.) He recommended cervical epidural steroid injection treatment. (R. at 235–36.) Finally, Dr. Paticoff described the Plaintiff's "[d]egree of [d]isability" as "[t]emporary totally disabled." (R. 235.)

The Plaintiff saw Dr. Paticoff for follow-up appointment**s** from October 22, 2009 to May 6, 2010. (R. 216–36.) During these visits, Dr. Paticoff provided the Plaintiff with trigger point injections and prescribed Voltaren gel and Flektor patches for mild pain relief. (Id.) During most of these visits, Dr. Paticoff noted that the Plaintiff reported "excellent" or "good" pain relief from the injections. (R. 217, 200, 222, 224, 226, 228.) In addition, on March 4, 2010, Dr. Paticoff changed the Plaintiff's degree of disability from "temporary totally disabled" to "moderate." (R. 220–21.)

### 3. Consultative Medical Evidence

On March 5, 2010, Dr. Peter Stefanides, an internist, conducted a consultative examination of the Plaintiff. (R. 194–197.) In a report of the examination, Dr. Stefanides stated that the Plaintiff told him that she experienced "multiple medical problems" since being involved in an automobile accident on March 17, 2009, including: (i) "ongoing headaches"; (ii) "numbness in both hands"; (iii) "ongoing neck pain"; and (iv) "intermittent" "lower back pain." (R. 194.)

Dr. Stefanides described the Plaintiff's daily living activities as follows:

> The claimant cooks once per week, cleans once per week and does laundry once every 2 weeks. She shops once a month. She does childcare. She showers, bathes, and dresses daily. She watches television.

(R. 195.)

In his notes describing the physical examination, Dr. Stefanides stated that the Plaintiff "appears to be in no acute distress. Gait normal. Can walk on heels and toes

without difficulty.  Squat full.  Stance is normal.  Uses no assistive devices."  (Id.)  He also wrote, "Cervical spine full flexion . . . . No scoliosis or kyphosis or abnormality in the thoracic spine."  (R. 196) He further noted that the Plaintiff had "full range of motion of shoulders, elbows, forearms and wrists bilaterally."  (Id.)  In addition, he stated that the Plaintiff had "no motor or sensory deficit" and that her "hand and finger dexterity are intact.  Grip strength 5/5 bilaterally."  (R. 197.)

## C. The Procedural Background

On October 14, 2009, the Plaintiff filed an application for disability insurance benefits in connection with injuries sustained to her spine and arm resulting from the March 17, 2009 automobile accident.  On March 29, 2010, the Social Security Administration (the "SSA") denied her application.

### 1. The January 25, 2011 Hearing

On April 22, 2010, the Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ").  ALJ Seymour Rayner was assigned to the case.  On January 25, 2011, he held a hearing where the Plaintiff and her counsel appeared, and the Plaintiff testified.

At the hearing, the Plaintiff testified that as a result of the March 17, 2009 automobile accident, she suffered a "herniated disc in my neck."  (R. 33.)  She testified that since the incident, she has experienced persistent numbness in her hands, headaches, and occasionally a "sharp shooting pain" in her neck.  (R. 34.)  On a scale of one to ten, she described the pain in her neck as an "eight or nine" without pain medication, and a "five, six" with pain medication. (Id.)

She testified that she can dress herself, shower, and cook but that she sometimes needs the help of her twelve year-old daughter to do so. (R. 36, 40–41.) She also stated that she often drives herself to her mother's house who lives five minutes away. (R. 40.) Further, she testified that in August 2009, after the accident, she went on a two-week trip to Jamaica because of a death in the family. (R. 46.)

When asked "at the present time do you think you would be able to perform office type work on a full time basis working five days a week, eight hours a day," the Plaintiff responded, "I could do less than eight hours. Eight hours would be a little bit too much for me sitting there[.]" (R. 42–43.) However, she stated that she would have to take breaks during the day. (R. 43.)

### 2. The Relevant Analytical Framework

A claimant is entitled to benefits under the Act if she is able to show that she is disabled. 42 U.S.C.A. § 423 (West). Under Section 423(d)(1)(A) of the Act defines "disability" as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." In addition, the disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C.A. § 423(d)(2)(A) (West).

The SSA regulations set forth a five-step evaluation process to determine whether a claimant meets the definition of "disability." 20 C.F.R. § 404.1520. The Second Circuit has implemented that procedure as follows:

(1) "the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity";
(2) "[i]f he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities";
(3) "[i]f the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience";
(4) "[a]ssuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work"; and
(5) "[f]inally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); see also Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (same); Gonzalez v. Colvin, No. 14-CV-06206 SN, 2015 WL 1514972, at *14 (S.D.N.Y. Apr. 1, 2015) (same).

A claimant bears the burden of proof as to the first four steps, but "'if the claimant shows that [her] impairment renders [her] unable to perform [her] past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform.'" Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) (quoting Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983)); see also Larocque v. Colvin, No. 8:13-CV-547 (MAD), 2015 WL 1482627, at *2 (N.D.N.Y. Mar. 31, 2015) (same).

### 3. The Decision by ALJ Rayner

On February 23, 2011, ALJ Rayner issued a written decision finding that the Plaintiff was not disabled under the Act and therefore, was not entitled to benefits. (R. 10–16.)

In that regard, ALJ Rayner found that the Plaintiff had met the first two steps of the five step analysis described above — namely, that the Plaintiff had (i) not engaged in a substantial

gainful activity since the March 17, 2009 automobile accident; and (ii) the Plaintiff's diagnosis of a "herniated disc and cervical radiculopathy" constituted a "severe impairment."  (R. 12.)

With respect to the third step — whether the claimant has an impairment listed in Appendix 1 of the Regulations — he found that the Plaintiff did not have an impairment or combination of impairments equal to one of the impairments listed in Appendix 1.  See 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

With respect to the fourth step — whether despite the impairment, the claimant has the residual functional capacity to perform her past work — he determined that the Plaintiff had the residual functional capacity to perform a full range of light work as defined in 20 CFR 404.1567(b), including her former job as a cashier.  (R. 12–13.)

"Light work" is defined by 20 CFR 416.967(b) as:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567.

In reaching this conclusion, ALJ Rayner first examined the Plaintiff's testimony.  (R. 13.) He determined that the Plaintiff's testimony that she suffered "neck and back pain and problems with her arms" could be reasonably expected to have been caused by her medically diagnosed injuries — a herniated disc and cervical radiculopathy.  (Id.)  However, he found that the Plaintiff's statements as to the "intensity, persistence and limiting effects" of her symptoms to be not credible in light of her own testimony and the medical evidence in the record.  (R. 13–14.)

In particular, after conducting a survey of the medical records of the Plaintiff's appointments with her treating physicians, ALJ Rayner found that the "clinical results obtained were not indicative of a severely disabling condition" and that "no treating physician found that the claimant was unable to perform at least light work[.]" (R. 14–15.)

In addition, he relied on the assessment of Dr. Stefanides, the consultative physician, who found that the Plaintiff was in no "acute distress" and "was able to walk on heals and toes without difficult, squat fully and had a normal gait." (R. 14.) ALJ Rayner placed "great weight" on the report by Dr. Stefanides because he found that the report was "consistent with the record as a whole." (Id.)

Further, ALJ Rayner noted that according to her own testimony, the Plaintiff was able to "engage in a full range of activities, including shopping, visiting family, using the computer, going to movies, cooking, . . . some cleaning, showers, and goes to the beauty parlor for hair grooms." (R. 15.) He also noted that M. Kelly, a "disability analyst" at the SSA, who met with the Plaintiff on January 15, 2010 regarding her application for disability benefits, observed that the Plaintiff "had no difficulty sitting one and a half hour for the interview[.]" (Id.)

In light of the evidence described above, ALJ Rayner found that the Plaintiff "has the residual functional capacity for a full range of light work[;] she can perform her past relevant work as a cashier." (Id.)

### 4. The Present Action

The Plaintiff appealed the decision by ALJ Rayner to the SSA Appeals Council. On August 8, 2012, the Appeals Council denied the Plaintiff's request for further review.

On October 9, 2012, the Plaintiff commenced the present action pursuant to 42 U.S.C. § 405(g) seeking the reversal of the final determination by the SSA Appeals Council denying the Plaintiff's application for social security disability benefits.

## II. DISCUSSION

### A. Legal Standards

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)).

Thus, when reviewing the Commissioner's decision to deny benefits, the Court "first reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see also Arzu v. Colvin, No. 14 CIV. 2260 JCF, 2015 WL 1475136, at *8 (S.D.N.Y. Apr. 1, 2015) ("First, the court must decide whether the Commissioner applied the correct legal standard.") (citing Apfel, 167 F.3d at 773); see also Calvello v. Barnhart, No. 05 CIV. 4254 (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), report and recommendation adopted, No. 05 CIV 4254 SCR MDF, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008) (same).

Next, the Court examines the administrative record to "determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision[.]" Burnette v. Colvin, 564 F. App'x 605, 607 (2d Cir. 2014) (quoting Burgess, 537 F.3d at 128). "'Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Burgess, 537 F.3d at 128).

This standard is deferential to the findings of the ALJ. <u>See</u> <u>Brault v. Soc. Sec. Admin.</u>, Com'r, 683 F.3d 443, 448 (2d Cir. 2012) ("[Substantial evidence] is still a very deferential standard of review—even more so than the 'clearly erroneous' standard."). For example. "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits us to glean the rationale of an ALJ's decision.'" <u>Cichocki v. Astrue</u>, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1040 (2d Cir. 1983)). Moreover, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings '"must be given conclusive effect' so long as they are supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (quoting <u>Schauer v. Schweiker</u>, 675 F.2d 55, 57 (2d Cir. 1982)).

## B. As to the Plaintiff's Motion

As noted above, ALJ Rayner found that the Plaintiff had met the first two steps of the five step analysis described above — namely, that the Plaintiff had (i) not engaged in substantial gainful activity since the March 17, 2009 automobile accident; and (ii) the Plaintiff's diagnosis of a "herniated disc and cervical radiculopathy" was a "severe impairment." (R. 12.)

However, he found that the Plaintiff did not satisfy her burden with respect to the third and fourth steps, which require the Plaintiff to show that (i) she has an impairment listed in Appendix 1 of the SSA regulations; and (ii) if she does not have such an impairment, to show that that she does not have residual capacity to perform past work. <u>Rosa</u>, 168 F.3d at 77 (quoting <u>Berry</u>, 675 F.2d at 467).

As noted above, when reviewing the decision by ALJ to deny benefits under the Act, the Court must determine whether (i) the ALJ applied the correct legal standard; and (ii) ,

considering the record as a whole, determine if there is substantial evidence to support the Commissioner's decision.  Tejada, 167 F.3d at 773.

With respect to the first issue, the Plaintiff does not assert that ALJ Rayner applied an incorrect legal standard to her claim.  Moreover, the Court finds that ALJ Rayner applied the correct five step test set forth in the SSA regulations to determine whether she was disabled.  (R. 10–11.)  Accordingly, the Court need not address the first issue.

With respect to the second issue, as set forth below, the Court finds that (1) the decision by ALJ Rayner at the third step of the disability test — that the Plaintiff's injuries are not listed as an impairment on Appendix 1 of the SSA regulations — is supported by substantial evidence; and (2) the decision by ALJ Rayner at the fourth step of the disability test — that the Plaintiff has the residual capacity to perform her past work as a cashier — is also supported by substantial evidence.  The Court will address the third and fourth steps below.

**1. The Third Step of the Disability Analysis**

With respect to the third step, ALJ Rayner found that the medical record did not support a finding that the Plaintiff had a listed impairment.  (R. 12)  He noted that he considered Section 1.04 of Appendix 1 "in particular" but did not find that the Plaintiff met the criteria in that section.  (Id.)

ALJ Rayner could have been more explicit in his reasoning with respect to the third step by, for example, explaining what Section 1.04 states and why the Plaintiff does not meet the criteria set forth in that section.  However, despite the somewhat vague nature of his opinion on this point, the Court finds that his determination is supported by substantial evidence in the record.

At the third step of the disability determination, "[i]f [the] [p]laintiff's impairments, either separately or in combination, meets or equal a listed impairment in Appendix 1, and satisfies the 12–month duration requirement in 20 C.F.R. § 416.909, the ALJ must find the Plaintiff disabled. 20 C.F.R. § 416.920(d)." Mojica v. Comm'r of Soc. Sec., No. 13 CIV. 5631 KPF, 2014 WL 6480684, at *10 (S.D.N.Y. Nov. 17, 2014) (quoting 20 C.F.R. § 416.920(d)) (alteration in original).

Appendix 1 of the relevant SSA regulation, in turn, provides a list of impairments that constitute a disability under the Act, such as "special senses and speech," the "digestive system," "skin disorders," and the "musculoskeletal system." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Where, as here, the Plaintiff claims a disability resulting from a "disorder of the spine," such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture," the ALJ must look to Section 1.04 of Appendix 1. Id.

Section 1.04 provides that a disorder of the spinal cord will be classified as a disability if the medical evidence shows:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

With respect to Section 1.04(B), neither these tests, nor the physical exams conducted by her treating physicians, revealed evidence of "spinal arachnoiditis." Thus, that condition is not applicable here.

With respect to Section 1.04(A), the medical records contain extensive evidence of the Plaintiff's complaints of significant pain and numbness in her neck, back, and hands. However, her treating physicians did not find that the Plaintiff had any of the symptoms described in Section 1.04(A) — namely, "evidence of limitation of the spine, motor loss . . . accompanied by sensory or reflex loss." To the contrary, all of the reports of the physical exams performed on the Plaintiff by her doctors — including two internists, an osteopath, two orthopedic surgeons, and a pain management specialists — described the Plaintiff as having either full or, at most, moderately limited range of motion in her neck, arms, and hands. (See, e.g., R. 175, 177, 178, 205, 207, 209, 216–217.) This is a far cry from the significant limitations to sensory and reflex loss required under Section 1.04(a).

Accordingly, the Court finds that ALJ Rayner was correct in concluding that the Plaintiff did not have an impairment or a combination of impairments listed in Appendix 1 of the SSA regulations.

### 2. The Fourth Step of the Disability Analysis

As explained above, if a claimant does not show that he or she has a disability as categorized in Appendix 1, then the ALJ moves to the fourth step of the analysis to determine whether the claimant has the residual functional capacity to perform "any of his or her past relevant work despite the impairment." Abbott v. Colvin, No. 13-4893-CV, 2015 WL 74073, at *1 (2d Cir. Jan. 7, 2015) (quoting Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008)).

In the present case, the ALJ found that the Plaintiff had the residual functional capacity to do her past work as a cashier.

The Plaintiff challenges the determination by ALJ Rayner by advancing three primary arguments: (i) that he failed to provide an adequate basis for determining that she could perform "light work"; (ii) that he improperly discounted her testimony regarding the pain she experienced as a result of her injuries; and (iii) that he improperly concluded that she could return to her past work as a cashier. The Court will address each argument in turn.

### a. As to the Plaintiff's Residual Functional Capacity

The Plaintiff first argues that the determination by ALJ Rayner that she could perform "light work" was not supported by substantial evidence. The Court disagrees.

SSA policy statements define "residual functional capacity" as "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)); see also Mojica v. Comm'r of Soc. Sec., No. 13 CIV. 5631 (KPF), 2014 WL 6480684, at *12 (S.D.N.Y. Nov. 17, 2014). ("[Residual functional capacity] is defined as an individual's maximum ability to do physical or mental work despite the individual's limitations.").

In assessing a claimant's residual functional capacity, the ALJ is expected to consider all "'medically determinable impairments' and 'all of the relevant medical and other evidence,' including the intensity and persistence of claimant's symptoms." Mojica, 2014 WL 6480684 (quoting 20 C.F.R. § 416.945(a)(2), (3)).

In the present case, the Court finds that ALJ Rayner appropriately surveyed all relevant evidence in determining that the Plaintiff had a residual functional to perform "light work," which the SSA regulations define as a job that involves, among other things, "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567.

First, ALJ Rayner surveyed all of the medical evidence in the record. He noted that the X-Rays shown of the Plaintiff's spine, right shoulder, and right elbow were unremarkable and showed no acute fracture. (R. 14.) He also noted that none of the Plaintiff's treating physicians — including Drs. Gentile, Gonya, Cappellino, and Paticoff — found that the Plaintiff was unable to perform light work as a result of her injuries. (R. 15.) To the contrary, he pointed to multiple medical reports where her treating physicians found that although the Plaintiff was experiencing discomfort, she had good range of motion in her spine, neck, and arms, and retained strength and grip in her hands. (R. 14.)

He also relied on the assessment of Dr. Stefanides, a consultative physician, who wrote in a report of his physical examination of the Plaintiff that she "appears to be in no acute distress. Gait normal. Can walk on heels and toes without difficulty. Squat full. Stance is normal. Uses no assistive devices." (R. 195.) He further noted that the Plaintiff's own testimony indicated that she was able to conduct "daily activities" and that M. Kelly, a SSA disability analyst, found that the Plaintiff had no difficulty sitting for an hour and a half. (R. 15.)

Based on this assessment of the record, ALJ Rayner found the Plaintiff was capable of performing "light work." (Id.)

The Plaintiff argues that ALJ Rayner mischaracterized the diagnostic tests and reports by her treating physicians. In particular, she contends that the medical evidence clearly supports a

finding that she is disabled because it shows that she has a "disc herniation," "muscle spasms," and pain and "bilateral numbness" in her upper extremities. (The Pl.'s Mem. of Law at 19–20.) The Court disagrees.

Under the five step test only those impairments or combination of impairments in Appendix 1 result in an automatic finding of a medical disability. 20 C.F.R. § 416.920(a). As described above, the Plaintiff's medically diagnosed conditions — a herniated disc, muscle spasms, and numbness in her extremities — do not fall under any of the categories listed in Appendix 1. Thus, the fact the Plaintiff was diagnosed with these conditions does not, as the Plaintiff contends, necessitate a finding that she cannot perform light work. See Micheli v. Astrue, 501 F. App'x 26, 27-28 (2d Cir. 2012) ("'If, however, a claimant has a severe impairment that is not considered *per se* disabling under the Listings, step four compels the Secretary to ascertain his residual functional capacity, . . . a measure of employment capabilities[.]'") (quoting State of N.Y. v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990)).

In that regard, the Court finds that there is ample evidence in the record demonstrating the Plaintiff's treating physicians consistently described her as being, at most, moderately physically limited despite her injuries. For example, Dr. Gentile, an osteopath who examined the patient on multiple occasions from March 24, 2009 to July 2, 2009, generally noted in his medical reports that although the Plaintiff had "tender points in the right trapezial and levator region[s]," she also had full range of motion in her neck, elbow, and right shoulder and that X-Rays of these regions came out "negative." (R. 177, 178.) Dr. Capellino, an orthopedic surgeon who examined the Plaintiff on eight occasions from June 23, 2009 to April 14, 2010, also described the Plaintiff's injuries as "diffuse" resulting in some "tenderness," but otherwise not affecting the range of motion in her extremities. (R. 205, 207, 209, 211, 212, 213, 214, 215.)

Dr. Paticoff, a pain management specialist who treated the Plaintiff from October 22, 2009 to May 6, 2010, also noted spasms in her neck and back but found that the Plaintiff had "good range of movement in all directions." (R. 235.)

Accordingly, the Court finds that ALJ Rayner accurately described the medical evidence and that this evidence did substantially support his finding that the Plaintiff could perform light work. See Turner v. Comm'r of Soc. Sec., No. 12-CV-02259 CBA, 2014 WL 1310313, at *12 (E.D.N.Y. Mar. 31, 2014) ("Turner argues that the ALJ did not provide an adequate basis for his finding that Turner had the residual functional capacity to perform light work. The Court rejects this argument, as the ALJ adequately based his decision on the substantial record evidence indicating that Turner's impairment only minimally limited his ability to function.").

### b. As to the Credibility of the Plaintiff

Next, the Plaintiff asserts that the Court erred in discrediting her testimony regarding her symptoms of pain. (The Pl.'s Mem. of Law at 21.) Here again, the Court disagrees.

The Second Circuit has made clear that "subjective assertions of pain *alone* cannot ground a finding of disability." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (emphasis in original) (quoting 20 C.F.R. § 404.1529(a)); see also Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("[W]hile an ALJ 'is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929,' he or she is 'not require[d] to accept the claimant's subjective complaints without question[.]'") (quoting Genier, 606 F.3d at 49).

Rather, an ALJ must follow a two-step process for evaluating a claimant's assertions of pain and other limitations. 20 C.F.R. § 404.1529(b)). "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Genier, 606 F.3d at 49 (citing 20 C.F.R. §

404.1529(b)).  "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record."  Id. (quoting 20 C.F.R. § 404.1529(a)).

When making such a credibility determination, the ALJ must consider "all of the evidence presented, including information about [a claimant's] prior work record, [a claimant's] statements about [his] symptoms, evidence submitted by [a claimant's] treating or nontreating source, and observations by [SSA] employees and other persons."  Padula v. Astrue, 514 F. App'x 49, 50-51 (2d Cir. 2013) (quoting 20 C.F.R. § 416.929(c)(3)) (alterations in original).

Here, ALJ Rayner correctly followed the required process in evaluating the Plaintiff's credibility.  As required by the regulations, he first found that the Plaintiff's symptoms of pain — including headaches, pain in her neck and back, and numbness in her upper extremities — could be caused by the injuries that the Plaintiff sustained in the March 17, 2009 car accident.  (R. 13.) However, he found that the Plaintiff's testimony regarding the "intensity, persistence and limiting effects of the[] [Plaintiff's] symptoms are not credible" when viewed in conjunction the "medical evidence of record and the claimant's own testimony."  (R. 13, 15.)

The Court finds that substantial evidence supports the conclusion by ALJ Rayner with regard to the Plaintiff's credibility.  As discussed above, ALJ Rayner properly noted that the Plaintiff's medical records are replete with references to the fact that despite her complaints of pain, the Plaintiff had full range of motion in her spine, back, and arms; no acute fractures, and "5/5" strength in her hands.  (R. 14.)

Furthermore, as the ALJ correctly noted, the medical records indicate that the Plaintiff responded well to the treatments prescribed by her doctors.  (R. 15.)  For example, Dr. Gentile,

an osteopath who treated the Plaintiff from March 24, 2009 to July 2, 2009, stated in his notes of four separate appointments with the Plaintiff that she "is doing very well with manipulation and injections." (R. 180, 181, 184, 185.) Similarly, Dr. Paticoff, a pain management specialist who treated the Plaintiff from October 22, 2009 to May 6, 2010, reported on multiple occasions that the Plaintiff was reporting "excellent" to "good" pain relief from the trigger point and steroid injections he administered. (R. 222, 226, 228.) Moreover, on March 4, 2010, presumably as a result of the Plaintiff's progress, Dr. Paticoff changed the Plaintiff's "degree of disability" from "temporary totally disabled" to "moderate." (R. 221.)

In light of the medical evidence described above suggesting that the Plaintiff did not have any significant functional limitations and was responding well to treatments, the Court concludes that the ALJ did not err in finding that the Plaintiff's allegations of pain were inconsistent with the medical evidence.

In addition to examining the objective medical evidence described above, ALJ Rayner properly considered the record as a whole in assessing the Plaintiff's testimony. See Turner, 2014 WL 1310313 at *10 (E.D.N.Y. Mar. 31, 2014) (noting that in assessing the claimant's credibility, "[t]he ALJ must also consider evidence beyond the objective medical evidence") (citing SSR 96–7P, 1996 WL 374186, at *3 (July 2, 1996)). He noted that M. Kelly, a SSA disability analyst, found that the Plaintiff had no difficulty sitting for an hour and a half. (R. 15.) He also relied on testimony by the Plaintiff that she could perform a full range of daily activities — including shopping, cooking, driving, and visiting family — and was able to travel to Jamaica for two weeks to visit family after the March 17, 2009 accident. (Id.)

The Plaintiff argues that ALJ Rayner mischaracterized her testimony. (The Pl.'s Mem. of Law at 25.) In this regard, she noted that she testified that while she could perform daily chores,

24

she often required the help of her twelve-year old daughter and her cousin in order to put on her jeans, wash her back, clean her house, shop, and cook.  (R. 36, 40.)  Moreover, while she stated that she often visited her mother's house, her mother only lived five minutes away from her house, and thus, the drive was not particularly onerous.  (R. 40)

While it may be that the Plaintiff's testimony is inconsistent with respect to the degree to which she is able to perform daily activities, it is not the job of this Court to resolve such inconsistencies.  Rather, "[i]t is the function of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Calzada v. Asture, 753 F. Supp. 2d 250, 268 (S.D.N.Y. 2010) (quoting Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).  Indeed, even where the administrative record may support a contrary finding, the ALJ's "factual findings" "'must be given conclusive effect' so long as they are supported by substantial evidence." Genier, 606 F.3d at 49 (quoting Schauer, 675 F.2d at 57).

Thus, the fact that there may be contradictory testimony in the record does not undermine the decision by ALJ Rayner on appeal.  That is because as noted above, there is substantial evidence in the medical records that the Plaintiff can perform "light work."  Thus, the Court finds that ALJ Rayner did not err in finding the Plaintiff's testimony not credible.  See Turner, 2014 WL 1310313 at *12 ("That testimony, along with [the Plaintiff's] admission that his medication helped the back pain . . . , is entirely consistent with the objective medical evidence in the record indicating that Turner was not disabled, and inconsistent with Turner's claim that he was in so much pain as to be completely unable to work."); Amons v. Astrue, 617 F. Supp. 2d 173, 176 (W.D.N.Y. 2009) ("On balance, the plaintiff's medical records and treating and examining physician reports simply do not support her claim of total disability.").

### c. As to the Plaintiff's Relevant Past Work

The Plaintiff also challenges the determination by ALJ Rayner that the Plaintiff is capable of performing past relevant work as a cashier.

Under the fourth step of the five-step analysis, "the claimant has the burden to demonstrate an inability to return to h[is] previous specific job and an inability to perform h[is] past relevant work generally." Petrie v. Astrue, 412 F. App'x 401, 409 (2d Cir. 2011) (quoting Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003)).

Work experience is considered to be "relevant" for these purposes when it is (1) "done within the last 15 years"; (2) lasted long enough for [the claimant] to learn to do it"; and (3) "constitutes substantial gainful activity." Melville v. Apfel, 198 F.3d 45, 53 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2).

In the present case, ALJ Rayner determined that the Plaintiff's job as a cashier was "relevant past work." (R. 15.) The record shows that the Plaintiff was employed as a cashier from 1992 to 2001 at various companies, including Kentucky Fried Chicken, Sears, BJ's Wholesale Club, Payless Shoe Source, and White Castle. (R. 111.) Therefore, there is ample evidence to show that the Plaintiff had done work as a cashier within the last 15 years and had sufficient time to learn the skills required for that job. See, e.g., Wiggins v. Barnhart, No. 01 CIV. 4285 (GEL), 2002 WL 1941467, at *9 (S.D.N.Y. Aug. 21, 2002) ("The record shows that [the] plaintiff had been employed by various companies in both a secretarial and clerical capacity from 1979 through 1989 . . . This 10–year period is ample time to develop the skills of this occupation, which clearly require significant and productive mental duties."); de Roman v. Barnhart, No. 03CIV.0075(RCC)(AJP), 2003 WL 21511160, at *14 (S.D.N.Y. July 2, 2003)

("Because [the plaintiff] worked as a machine operator in an umbrella factory from 1985 to 1991 . . , the ALJ correctly considered it to be past relevant work.").

With respect to the third requirement, the Plaintiff asserts that ALJ Rayner failed to adequately develop the record as to whether the Plaintiff's duties as a cashier constituted "substantial gainful activity." (The Pl.'s Mem. of Law at 23.) Again, the Court disagrees.

Under the relevant SSA regulations, "'work is to be considered 'substantial' if it "involves doing significant physical or mental activities[.]"' Melville v. Apfel, 198 F.3d 45, 53 (2d Cir. 1999) (quoting 20 C.F.R. § 416.972(a)). Work is considered to be "gainful" "if it is "the kind of work usually done for pay or profit, whether or not a profit is realized[.]" Id. (quoting 20 C.F.R. § 416.972(b)).

In that regard, SSA regulations set forth a threshold level of earnings from which the Commissioner can ordinarily infer that a claimant's prior work is "substantial gainful activity." Figueroa-Plumey v. Astrue, 764 F. Supp. 2d 646, 650 (S.D.N.Y. 2011) ("The Commissioner has established a threshold level of earnings that ordinarily show that the employee engaged in [substantial gainful activity].") (quoting 20 C.F.R. § 404.1574(b)(3)). Relevant to the instant case, from 1990 to June 1999, the earnings threshold is an average of $500 per month; and from July 1999 to December 2000, the earnings threshold is $700 per month. 20 C.F.R. § 404.1574.

If a claimant's past work meets this earnings threshold, it does not automatically establish the work as "substantial gainful activity." However, to the extent that the earnings threshold is met, the claimant's past work will "presumptively be considered substantial gainful activity." Parker v. Astrue, No. 106-CV-1458 GLS/VEB, 2009 WL 3334341, at *12 (N.D.N.Y. Oct. 14, 2009) (quoting 20 C.F.R. 404.1574(b)(2)); see also Dyer v. Colvin, No. 13-CV-6312P, 2015 WL 1458511, at *13 (W.D.N.Y. Mar. 30, 2015) ("The regulations provide earnings guidelines that

set a floor for earnings that presumptively constitute substantial gainful activity.") (internal quotation marks omitted).

Even where a claimant's earnings fall below the threshold established by the SSA regulations, some courts have found a claimant's past job to be "substantial gainful activity" based on evidence that the plaintiff held the job for a long period of time. For example in Wiggins v. Barnhart, No. 01 CIV. 4285(GEL), 2002 WL 1941467, at *9 (S.D.N.Y. Aug. 21, 2002), the court found that a plaintiff's employment at various companies in a "secretarial and clerical capacity" constituted "substantial gainful activity." The court found the work was "gainful" because "the record shows that [the] plaintiff held paid positions throughout her employment." Id. The court further found that the plaintiff's work to be substantial because she held clerical jobs for a ten year period, which the court found to be enough time to develop skills that require "significant and productive mental duties." Id.; see also Parker v. Astrue, No. 106-CV-1458 GLS/VEB, 2009 WL 3334341, at *12 (N.D.N.Y. Oct. 14, 2009) ("[The] [p]laintiff's employment as a housekeeper lasted for more than seven (7) years. Given [the] [p]laintiff's testimony and work history, this [c]ourt finds that the ALJ's conclusion that these jobs constituted past relevant work was supported by substantial evidence.").

In the present case, the Plaintiff worked at Payless in 2000. (R. 93–94.) According to the tax statements filed with the Plaintiff's application for benefits, in 2000, she earned a total of $13,822.82, of which $10,093.74 was from her work as a cashier at Payless. (R. 93–94.) It is not clear where she earned the other $3,729.08.

In any event, as noted above, the SSA regulations provide that where there is evidence that a claimant earned an average of $700 per month from July 1999 to December 2000, that job will be presumptively considered "substantial gainful activity." 20 C.F.R. § 404.1574. Since the

Plaintiff earned more than $1,000 per month while working as a cashier for Payless in 2000, her work at Payless presumptively qualifies as "substantial gainful activity." 20 C.F.R. § 404.1574.

The Plaintiff has offered no evidence to rebut the presumption that her prior work as a cashier at Payless was not substantial gainful activity. Moreover, the fact that she was employed as a cashier from 1992 to 2001 by four other businesses — Kentucky Fried Chicken, Sears, BJ's Wholesale Club, and White Castle — provides further evidence that the Plaintiff acquired certain skills in her work that should be considered "substantial gainful activity. See Wiggins, 2002 WL 1941467 at *8 (finding that an ALJ did not err in finding that the plaintiff's work as a secretary and a clerk was substantial gainful activity because she worked in that capacity for "various companies" for a 10-year period and was paid for her work). Accordingly, the Court finds that there is substantial evidence to support a finding that the Plaintiff's past work as a casher is substantial gainful activity.

Finally, the Plaintiff asserts that even if her work as a cashier could be considered "relevant past work," there is not substantial evidence in the record showing that she can perform the functions generally required of cashiers. (The Pl.'s Reply Mem. of Law at 7.) In particular, she argues that the duties of a cashier necessarily require the "constant use of the hands for reaching, handling, and fingering." (Id.) The Plaintiff contends that the medical evidence "clearly" establishes that the Plaintiff experiences numbness in her hands, which would preclude her from performing these tasks. Here too, the Court disagrees.

ALJ Rayner determined that the Plaintiff could perform the duties generally required of cashiers. (R. 15.) In so determining, he relied on the definition of "cashier-checker" from the Department of Labor Dictionary of Occupational Titles ("DOT") § 211.462-014. That section classifies the job of a cashier as "light work" because it may require "[e]xerting up to 20 pounds

of force occasionally . . . and/or up to 10 pounds of force frequently …. and/or a negligible amount of force constantly." Since ALJ Rayner found, based on his review of the medical evidence, that the Plaintiff had a residual functional capacity to perform "light work," he concluded that she could perform her past job as a cashier. (R. 15.)

As noted above, despite her expressed discomfort, none of the doctors who examined the Plaintiff found that her range of motion or level of strength in her elbow, hand, or fingers were significantly affected by her injuries. For example, Dr. Stefanides, the consultative physician, described her as having "5/5" "strength in the upper and lower extremities." (R. 196.) Similarly, Dr. Paticoff, the Plaintiff's pain management specialist, performed a neurological exam on the Plaintiff and found that she had "4/5 motor strength RUE and 5/5 motor strength LUE" and a "mild" decrease in sensation to light touch over medial right distal upper extremity." (Id.) Dr. Cappellino, the Plaintiff's treating orthopedic surgeon, also described the Plaintiff's right shoulder, right elbow, and right wrist as showing "no tenderness" and full "range of motion." (R. 235.)

Based on the medical records showing that the Plaintiff had at most "modest" limitations on the strength and agility of her upper extremities, the Court finds that there is substantial evidence in the record to support the determination by ALJ Rayner that the Plaintiff could perform the duties of a cashier. Accordingly, the Court affirms the decision by ALJ Rayner to deny the Plaintiff disability benefits at the fourth step of the disability test.

### III. CONCLUSION

For the foregoing reasons, the Defendant's cross motion for judgment on the pleadings is granted, and the Plaintiff's motion for judgment on the pleadings is denied.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
April 13, 2015


                                        _/s/ Arthur D. Spatt_
                                      ARTHUR D. SPATT
                                    United States District Judge